IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| MARLA R. SMITH, | ) | |
| by and through her next friend, | ) | |
| Jasmine Rachelle Smith, *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL CASE NO.: 2:20-cv-237-ECM |
| | ) | (WO) |
| KAY IVEY, | ) | |
| Governor of the State of Alabama, | ) | |
| in her official capacity, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION and ORDER**

**I.      INTRODUCTION**

Marla Renea Smith, by and through her next friend and sister, Jasmine Rachelle Smith, (hereinafter "Plaintiff") brings this suit against the following Defendants in their official capacities: Alabama Governor Kay Ivey ("Governor Ivey"), Director of Emergency Management for the Emergency Management Agency of Alabama Brian Hastings ("Hastings"), and State Health Officer at the Alabama Department of Public Health ("ADPH") Scott Harris ("Harris") (collectively "Defendants").  Smith alleges that the Defendants are in violation of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 because of discriminatory language found in the ADPH's Annex to the Emergency Support Function ("ESF") 8 ("the Annex") included within the State Emergency Operating Plan ("EOP").  She also asserts that she brings her

claims under 42 U.S.C. § 1983.[1]  The Plaintiff requests that the Court issue a declaratory judgment finding that the Annex is null and void and in violation of the ADA and the Rehabilitation Act, enjoin the enforcement of the plan insofar as it prevents individuals with mental disabilities from having equal access to ventilators, retain jurisdiction of the case, and grant the Plaintiff equitable relief.

Pending before the Court are multiple motions: the Plaintiff's motion for preliminary injunction filed on May 6, 2020 (doc. 8); Defendant Harris's motion to dismiss for lack of jurisdiction filed on May 11, 2020 (doc. 9); Defendants Hastings and Governor Ivey's motion to dismiss for failure to state a claim filed on May 11, 2020 (doc. 11); the Plaintiff's motion to strike filed on June 15, 2020 (doc. 19); and the Plaintiff's motion for summary judgment filed on June 22, 2020 (doc. 21).  Furthermore, the Defendants request that their motion to dismiss under 12(b)(6) be treated as a summary judgment motion under Fed. R. Civ. P. 56, based on the Plaintiff's presentation of matters outside the complaint. Fed. R. Civ. P. 12(d).  On July 30, 2020, the Court heard oral argument on the pending motions, and they are ripe for consideration.[2]

---

[1] The Plaintiff has sued the Defendants under 42 U.S.C. § 1983, but she does not assert any constitutional claims. (Doc. 1).  No substantive rights are created by § 1983; it merely provides a remedy for deprivations of federal rights created elsewhere. *Wideman v. Shallowford Cmty. Hosp., Inc.*, 826 F.2d 1030 (11th Cir. 1987).  To be successful on a § 1983 claim, a plaintiff must establish that (1) hse suffered a deprivation of rights, privileges, or immunities secured by the Constitution and the laws of the United States, and (2) the act or omission causing the deprivation was committed by a person acting under color of state law. *Id.* However, the Plaintiff does not have to bring claims under § 1983 to assert a cause of action under the ADA or the Rehabilitation Act.  While the Plaintiff asserts in her brief that it should be apparent that she asserted an equal protection claim, the complaint is devoid of reference to either the Fourteenth Amendment or the Equal Protection Clause. (Doc. 1).

[2] The Plaintiff also moves to strike the affidavit of Eric Jones. (Doc. 19).  The Court declines to strike the affidavit and will give it the weight it is due.  In any event, the affidavit does not alter the findings in this opinion.

After careful review of the briefs filed in support of and in opposition to each motion, the supporting and opposing evidentiary materials, the supplementary briefing on the issue of standing, arguments of counsel, and the applicable law, the Court concludes that the Plaintiff does not have standing because the Annex is no longer in effect. Therefore, the Court lacks jurisdiction, and the case is due to be dismissed without prejudice. *See Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) (noting that a dismissal for lack of standing should be entered without prejudice).

## II.   BACKGROUND

The facts of this case span several decades and delve into multiple State legislative and executive actions. Accordingly, the Court will attempt to outline the facts in a digestible format.

### A. The Plaintiff's Background and Procedural History

Marla Renea Smith is a woman over the age of 21 with a severe intellectual disability. Her sister, Jasmine Rachelle Smith, provides help to her because Marla Smith cannot make decisions for herself without significant assistance from others. Jasmine Smith filed this suit on or about April 9, 2020[3] on behalf of her sister in response to the language found in the ventilator triaging Exclusion Criteria found in the Annex to ESF 8. The Plaintiff alleges that, due to the Annex, she is at risk of having a ventilator illegally

---

[3] There is some dispute over the date of filing. The court system shows that the complaint was filed on April 9, 2020 at 9:57 AM. (Doc. 1 at 1, 1-2 at 1, and 1-3 at 1). The Plaintiff asserts that the case was filed on April 8, 2020 at some time before 2:22 PM, but the filing was delayed. (Doc. 16-1).

withheld from her based on her intellectual disability, in violation of the ADA and Section 504 of the Rehabilitation Act of 1973.

Upon review of the cross motions in this case, the Court required the parties to file additional briefs on standing.  The parties addressed the issue of standing and all pending motions at the hearing on July 30, 2020.

**B. The Creation of the Annex to ESF 8**

*1. Development of the State EOP Pursuant to the EMA*

The Alabama Emergency Management Act of 1955 ("EMA") established the Alabama Emergency Management Agency to protect the public peace, health, and safety in the event of a State-wide emergency. Ala. Code §§ 31-9-2 & 31-9-4 (1975).  The Director of Emergency Management is the executive head of the agency and "coordinate[s] the activities of all organizations of emergency management within the state." Ala. Code § 31-9-4(d).  The Governor is also authorized:

> [t]o prepare a comprehensive plan and program for the emergency management of this state, such plan and program to be integrated and coordinated with the emergency management plans of the federal government and of other states to the fullest possible extent, and to coordinate the preparation of plans and programs for emergency management by the political subdivisions of this state, such plans to be integrated into and coordinated with the emergency management plans and programs of this state to the fullest possible extent.

Ala. Code § 31-9-6.  "All orders, rules, and regulations promulgated by the Governor as authorized by this article shall have the full force and effect of law when a copy thereof is filed in the office of the Secretary of State." Ala. Code § 31-9-13.

On February 15, 1994, then Governor Jim Folsom issued Executive Order No. 15 pursuant to the EMA, Ala. Code § 31-9-1, et seq., to empower the Alabama Emergency Management Agency to prepare for emergency responses. (Doc. 23-1).  The Executive Order required the development of the State EOP, which "shall be followed in conducting emergency activities." (*Id.* at 2).  The Executive Order also requires the development of agency policies in conjunction with the EOP.  The order stipulates:

> IT IS FURTHER ORDERED, that each department or agency assigned a primary responsibility shall prepare a functional annex, an implementation strategy that sets forth policies and provisions for carrying out the various emergency services it will undertake and will coordinate with the AEMA to properly interface with all providers of emergency assistance.

(*Id.* at 3).  Accordingly, the agencies affected by the Executive Order set about developing their own annexes to the EOP.

The most recent iteration of the State EOP was prepared in March 2017. (Doc. 17-1).  The plan provides, "[t]his plan, including updates, remains in effect from the time of adoption until modified by changes in policy, planning guidance, or executive order." (*Id.* at 4).  The plan is "developed, promulgated, and maintained under State and Federal statutes and regulations," including the Alabama EMA, six executive orders, and the Alabama Anti-Terrorism Act of 2002. (*Id.* at 5).  Those State agencies which are expected to be involved with emergencies are assigned various ESFs.  The agencies with "primary support responsibilities will be responsible for implementing and maintaining respective Emergency Support Annexes." (*Id.* at 36).  One of these ESFs is "ESF #8 – Public Health and Medical Services."  The agency primarily responsible for ESF 8 is the ADPH. (*Id.*).

### 2. *Annex to ESF 8*

Attached to the 2017 EOP is the ADPH's Annex to ESF 8, or "Criteria for Mechanical Ventilator Triage Following Proclamation of Mass-Casualty Respiratory Emergency."  The Defendants represent that the Annex was developed in 2010 by the ADPH in response to fears of a future pandemic. (Doc. 9 at 9).  They state that the Annex was created "with input from multiple medical, legal, religious, academic, and ethics professionals, consistent with then-current best practices during a pandemic." (*Id.*).  The Annex "outlines a ventilator triage protocol intended for use only during a mass casualty event, proclaimed as a public health emergency by the Governor." (Doc. 8-1 at 2).  Its purpose is to be "[o]ffered as a template for inclusion in hospital disaster plan/policy following declaration of statewide, regional, or national public health respiratory emergency." (*Id.*).  Thus, because it is a template, it is not mandatory, but "[i]t is highly recommended" that stakeholders endorse the document. (*Id.* at 2–3).

The Annex further creates three tiers of triaging guidelines for hospitals to follow, depending on triggering events within the State. (*Id.* at 3).  For example, for Tier 1, a "[p]roclamation of a state of public health emergency by the Governor is a *necessary* initial trigger. All hospitals will implement Tier 1 upon the Governor's proclamation." (*Id.* at 4).  But Tiers 2 and 3 provide that they are hospital-specific choices, depending on the unique situation each hospital faces.  The Annex also provides a flow chart of steps hospitals should take when the Governor issues a proclamation of a state of public health emergency. (*Id.* at 6).  The first step cancels all elective surgeries that may require post-operation ventilators. (*Id.*).  The second alerts staff to the Annex criteria for all incoming Emergency

Department patients. (*Id.*).  Central to this case, the third step requires hospital staff to evaluate all patients with a respiratory illness based on the Exclusion Criteria outlined in Appendix 1. (*Id.*).  Should an eventual ventilator shortage arise, then Tiers 2 and 3 could be triggered, leading to removal of patients from ventilators if they meet certain Exclusion Criteria. (*Id.*).

The Exclusion Criteria in Appendix 1 include numerous medical conditions, such as cardiac arrest, severe trauma, dementia, metastatic malignancy, severe burn, and end stage organ failure. (*Id.* at 7).  Neurological diagnoses are listed as one form of end stage organ failure. (*Id.*).  Appendix 2 provides a detailed explanation of what qualifies as a neurological condition for purposes of the Exclusion Criteria. (*Id.* at 9).  The description reads, "persons with severe mental retardation, advanced dementia or severe traumatic brain injury may be poor candidates for ventilator support. . . . Persons with severe or profound mental retardation, moderate to severe dementia, or catastrophic neurological complications such as persistent vegetative state are unlikely candidates for ventilator support." (*Id.*).

In 2017, the State formed a new Crisis Standards of Care ("CSC") Working Group.[4] (Doc. 9 at 9).  This group reviewed old guidelines, including the Annex to ESF 8. (*Id.*). New CSC Guidelines—which still included the Annex to ESF 8—were submitted for review to a subject matter expert in 2019, who determined that the Exclusion Criteria in the ventilator triaging guidelines were not accepted or appropriate. (*Id.* at 10).  The State

---

[4] Whether the CSC Guidelines were developed appropriately is not an issue currently before the Court.

then removed the Annex from the CSC Guidelines on February 28, 2020. (*Id.*).  The Annex, however, remained on some State websites. (*Id.*).

### C.  Declaration of State of Emergency in Alabama due to COVID-19

On March 13, 2020, Governor Ivey declared a State of Emergency pursuant to the EMA, Ala. Code § 31-9-8, in response to the rapidly spreading novel COVID-19 ("coronavirus"), which the World Health Organization declared a worldwide pandemic in March 2020.  Governor Ivey issued the March 13 Proclamation in response to the appearance of the virus in Alabama and directed the appropriate State agencies to respond to the public health emergency.  Governor Ivey concluded, "I declare that this proclamation and all subsequent orders, laws, rules, or regulations issued pursuant hereto shall remain in full force and effect for the duration of the public health emergency unless rescinded or extended by proclamation."  (Doc. 25-1 at 3).

Since the initial Proclamation, Governor Ivey has adopted at least one agency rule as a proclamation filed with the Secretary of State.  In that instance, she recognized that the State Health Officer had promulgated an emergency rule called the "Order of the State Health Officer Suspending Certain Public Health Gatherings Due to Risk of Infection by COVID-19." (Doc. 29-1 at 3).  The emergency rule was adopted by the State Health Officer pursuant to the Alabama Administrative Procedure Act ("AAPA") and was "effective for a period of not longer than 120 days and shall not be renewable." Ala. Code § 41-22-5(b)(1).  Because the emergency rule could not be re-adopted, Governor Ivey included the rule, or the "Safer at Home order," as a part of her Proclamation, promulgating it "as an order, rule, or regulation under the applicable provisions of the Emergency Management

Act." (Doc. 29-1 at 3) (citing Ala. Code § 31-9-6(1) & 31-9-13). The Safer at Home order suspends certain public gatherings, requires a fourteen-day quarantine for any individual who receives a positive coronavirus test result, and outlines other requirements and recommendations to help slow the spread of the virus. (*Id.*).

### D. Resolution of Complaint Filed with the Office for Civil Rights at the United States Department of Health and Human Services and the Removal of Annex to ESF 8

The Office for Civil Rights ("OCR") at the United States Department of Health and Human Services ("HHS") has jurisdiction to enforce Title II of the ADA and Section 1557 of the Patient Protection and Affordable Care Act. 42 U.S.C. § 2000d; 45 C.F.R. §§ 80.1–80.13. HHS OCR's compliance review process is exercised over complaints that fall within its jurisdiction. The agency explains,

> [i]f the evidence indicates that the covered entity was not in compliance with the applicable regulation or law, OCR will attempt to resolve the case by obtaining corrective action through a voluntary agreement with the covered entity. OCR will notify the complainant and the covered entity of the result of the investigation.
>
> If the covered entity does not take voluntary action to resolve the matter in a way that is satisfactory, OCR will issue a Letter of Findings that describes how the covered entity is not in compliance and identifies next steps, which may include referral to the Department of Justice for enforcement action; steps to terminate Federal financial assistance to the covered entity; or other actions.

Office for Civil Rights, *How OCR Enforces Civil Rights Discrimination Laws and Regulations*, U.S. DEP'T OF HEALTH AND HUMAN SERVS. (Sept. 29, 2015),

https://www.hhs.gov/civil-rights/for-providers/compliance-enforcement/enforcement-process/index.html (last visited Nov. 18, 2020).

Even though the Annex to ESF 8 was removed from the CSC Guidelines on February 28, 2020, it remained on some State websites. Thus, on March 24, 2020, the Alabama Disabilities Advocacy Program filed a complaint with the HHS OCR, arguing that the ADPH's Annex to ESF 8 did not comply with Section 504 of the Rehabilitation Act of 1974, Title II of the ADA, or Section 1557 of the Affordable Care Act. (Doc. 9 at 8). Beginning on April 4, 2020, the State of Alabama participated in compliance review with the HHS OCR. The Notice to the Department explains, "the complaint alleges that ADPH's policy, *Emergency Operations Plan: Criteria for Mechanical Ventilator Triage* (2010 Ventilator Triage Guidelines) unlawfully singles out and authorizes the denial of treatment to individuals with disabilities." (Doc. 9 at 8).

The HHS OCR closed its investigation on April 8, 2020 as "satisfactorily resolved without a finding of liability." (*Id.* at 29). Under the HHS OCR agreement, Alabama agreed to: (1) remove all links to the 2010 Exclusion Criteria from websites; (2) comply with civil rights law; (3) clarify publicly that the 2010 criteria are not in effect; (4) not include similar provisions singling out individuals with disabilities for unfavorable treatment or use age cutoffs in future CSC guidelines; and (5) not interpret current guidelines in such a manner. (*Id.*).

Consequently, the State posted new guidelines on its website in April 2020.[5] (Doc. 16 at 5, n.8).  The ADPH also modified its website on April 22, 2020 to read,

> [t]he Ventilator Triage Guidance posted in 2010 is no longer in effect. It has been replaced by the Alabama Crisis Standards of Care Guidelines. The Alabama Crisis Standards of Care Guidelines are the only crisis care guidelines endorsed by the Alabama Department of Public Health. All people deserve compassion and equal respect, and with this in mind, the allocation of care cannot discriminate based on race, color, national origin, disability, age, sex, exercise of conscience or religion.

(Doc. 9 at 43).  Finally, on May 6, 2020, the State received a formal notice from the HHS OCR that its review was satisfactorily resolved. (*Id.* at 12).  The Plaintiff disputes that these steps sufficiently revoked the Annex.

## III.    STANDARD OF REVIEW

Pending before the Court are a motion for preliminary injunction, motions to dismiss, and motions for summary judgment.  Each type of motion requires the application of a different standard of review.

### A. Motion for Preliminary Injunction

The decision to grant or deny a preliminary injunction "is within the sound discretion of the district court." *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002). To prevail on her motion for a preliminary injunction, the Plaintiff bears the burden of demonstrating:

---

[5] The exact date is either April 8, 2020 or April 18, 2020.  The Plaintiff states, "[r]egarding publication of the Guidelines on the internet, we note that Defendant's submissions appear to include a scrivenor's error, insofar as they suggest the Guidelines were published on the internet on April 8, 2020. A thorough search of internet archives reveals no record of the web page in question (i.e., with the guidelines) before April 18, 2020)." (Doc. 16 at 5, n.8).

> (1) a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) an injunction would not disserve the public interest.

*North Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1217 (11th Cir. 2008) (quoting *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246–47 (11th Cir. 2002)); *see also Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004) (quoting *Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (*en banc*) (per curiam)).  "In this Circuit, [a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to each of the four prerequisites." *Siegel*, 234 F.3d at 1176.

### B. Motions to Dismiss

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint against the legal standard set forth in Rule 8: "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U. S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U. S. 544, 570 (2007)).

However, a defendant may attack the plaintiff's subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) through a facial attack or a factual attack. *Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir. 1990) (per curiam).  Facial attacks require the Court to determine whether "the plaintiff has sufficiently alleged a basis of subject matter

jurisdiction, and the allegations in [her] complaint are taken as true for the purposes of the motion." *Id.* (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)).[6] A factual attack challenges instead "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Id.* (quoting *Menchaca*, 613 F.2d at 507).

In this case, the Defendants bring a factual attack on the Plaintiff's subject matter jurisdiction. *See Stalley ex rel. U.S.*, 524 F.3d at 1232. Accordingly, the Court may consider facts outside the pleadings.[7] *See Kennedy v. Beachside Commercial Props., LLC*, 732 F. App'x 817, 822 (11th Cir. 2018) (noting that standing is a "fact-sensitive inquiry"). "On a factual attack of subject matter jurisdiction, a court's power to make findings of facts and to weigh the evidence depends on whether the factual attack on jurisdiction also implicates the merits of plaintiff's cause of action." *Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256, 1261 (11th Cir. 1997) (citing *Lawrence*, 919 F.2d at 1261). When the facts do not implicate the merits of the plaintiff's cause of action,

> the trial court may proceed as it never could under 12(b)(6) or Fed.R.Civ.P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

---

[6] *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[7] While the Court recognizes that *Kennedy v. Beachside Commercial Properties, LLC* is an unpublished opinion, the Court finds the principles stated in *Kennedy* persuasive.

*Lawrence*, 919 F.2d at 1528–29 (quoting *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981)).   When the merits of a plaintiff's cause of action are implicated, the proper course is for the court to convert the 12(b)(1) motion into a Rule 12(b)(6) motion. *Whitson v. Staff Acquisition, Inc.*, 41 F.Supp.2d 1294, 1297 (M.D. Ala. 1999).

Thus, in order to determine whether the Plaintiff has standing, the Court must consider whether the Defendants' factual attack goes to the merits of the Plaintiff's case. *See Garcia*, 104 F.3d at 1261.   "[S]ubject-matter jurisdiction is inextricably intertwined with the merits of the case" when "the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action." *Estate of Kerrigan v. Kerrigan*, 2019 WL 6560027, at *3 (M.D. Ala. Dec. 4, 2019) (internal quotations and citations omitted).   Thus, jurisdiction is "inextricably intertwined" with the merits of a plaintiff's claims when "a decision on one would effectively decide the other," *Lawrence*, 919 F.2d at 1529, and when "a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief." *Turcios v. Delicias Hispanas Corp.*, 275 F. App'x. 879, 888 (11th Cir. 2008) (quoting *Morrison v. Amway Corp.*, 323 F.3d 920, 926 (11th Cir. 2003)).

Here, the Court has original subject matter jurisdiction over the Plaintiff's discrimination claim pursuant to 28 U.S.C. § 1331.   However, in determining jurisdiction and in reviewing the Plaintiff's substantive claim for relief, the Court is not required to interpret the provisions of the Annex to ESF 8 itself and evaluate the Plaintiff's claims under the ADA and Section 504 of the Rehabilitation Act of 1973.   Consequently, the merits of the federal cause of action are not inextricably intertwined with the Defendants'

jurisdictional challenge. *See Estate of Kerrigan*, 2019 WL 6560027, at *5. The Court will review the Defendants' Rule 12(b)(1) motion accordingly, with substantial authority to weigh the evidence. *Lawrence*, 919 F.2d at 1528–29.

### C. Motion for Summary Judgment

Under Rule 56(a) of the *Federal Rules of Civil Procedure*, a reviewing court shall grant a motion for "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56). The movant can meet this burden by presenting evidence demonstrating there is no dispute of material fact, or by showing that the non-moving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id.* at 322–23. Only disputes about material facts will preclude the granting of summary judgment. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 249 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (citing *Anderson*, 477 U.S. at 248).

Once the movant has satisfied this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Non-movants must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A) & (B).

In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998–99 (11th Cir. 1992).

## IV.   DISCUSSION

As an initial inquiry, the Court must satisfy itself that it has jurisdiction and must do so before reaching the merits.  The Court will make that determination by weighing the evidence.  For the Court to have jurisdiction, the Plaintiff must establish Article III standing.  The Plaintiff's standing to bring this suit rises and falls on whether the Annex to ESF 8 is still in effect.  If the Annex is no longer in effect, then the Plaintiff is not at risk of future injury by having a ventilator discriminatorily withheld from her and therefore

does not present an injury in fact.  For the following reasons, the Court finds that the Annex is not in effect.  Consequently, the Plaintiff does not have standing.

### A. Article III Standing

Article III, § 2 of the Constitution limits federal court jurisdiction to "Cases" or "Controversies." U.S. CONST. art. III, § 2.  "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976)). Accordingly, the Court must determine whether it has jurisdiction before it can proceed to the merits of the case. *See Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020).  To this end, the Court must first consider whether the Plaintiff has Article III standing. *See id.*

It is well settled that standing requires (1) an injury in fact, both "concrete and particularized" and "actual or imminent," (2) "a causal connection between the injury and the conduct complained of," and (3) likely redressability by the court. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  A plaintiff bears the burden of establishing standing through these elements. *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016).

"[T]he injury-in-fact requirement requires a plaintiff to allege an injury that is both 'concrete *and* particularized.'" *Id.* at 1545 (quoting *Friends of the Earth v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000)) (emphasis in original).  First, to be concrete, an injury must actually exist; it must be real and not abstract. *Id.* at 1548.  "As a general matter,

tangible injuries qualify as concrete," although intangible harms can as well.[8] *Trichell*, 964 F.3d at 997.   The threat of a future injury can be concrete enough to create standing. *See*, *e.g.*, *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 692–96 (7th Cir. 2015) (finding that the risk of injury as a result of personal data theft was sufficient for standing purposes because there was an "objectively reasonable likelihood" that the injury would occur). Second, "[f]or an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo*, 136 S.Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560, n.1).

However, when considering future risk-as-injury, the Court must also consider whether the risk is "material," *Muransky v. Godiva Chocolatier, Inc.*, --- F.3d ----, 2020 WL 6305084, at *7 (11th Cir. Oct. 28, 2020) (*en banc*), and whether the risk dissipated before filing suit. *Trichell*, 964 F.3d at 1000.   "Article III demands that an 'actual controversy' persist throughout all stages of litigation." *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013) (citing *Already, LLC v. Nike*, 568 U.S. 85, 90–1 (2013)); *see also Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) ("[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.") (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)).   A plaintiff must have standing at the time of the filing, and a plaintiff still may lose standing over time if the actual controversy dissipates. *Hollingsworth*, 570 U.S. at 705.

---

[8] The Plaintiff suggests that her alleged risk of injury may be intangible because she seeks to vindicate her substantive right "to be free from discrimination prohibited by Federal law." (Doc. 28 at 4).   However, if she did have a ventilator withheld from her on the basis of her disability, the Plaintiff's injury would be tangible.   A tangible harm is one "[h]aving or possessing physical form; corporeal." *Tangible*, BLACK'S LAW DICTIONARY (11th ed. 2019).   Regardless, the Court concludes that she does not have standing because there is no longer a risk of this injury posed by the Annex to ESF 8.

**B.  Standing Analysis**

>    *1.  The Plaintiff does not allege an injury in fact.*

The Plaintiff does not have standing because she cannot demonstrate an injury in fact.  She alleges a risk of future injury: that she will have a ventilator withheld from her due to her disability because of the language contained in the Annex.  The Court finds that this possibility no longer exists.

When considering risk-as-injury, the Court must determine whether the risk actually exists or whether the risk posed to the Plaintiff dissipated.  *Trichell*, 964 F.3d at 1000.  The Plaintiff must demonstrate that the "material risk of harm" posed is "important; essential; relevant."  *Muransky*, 2020 WL 6305084, at *7.  "Whatever 'material' may mean, conceivable and trifling are not on the list."  *Id.*  For example, in *Trichell*, the plaintiffs sued after they received collection letters in the mail, proposing new debt repayment plans for each plaintiff's outstanding debt. 964 F.3d at 995.  However, if the plaintiffs accepted the debt repayment plans, they would subject themselves to a new statute of limitations on recovery of their outstanding debt. *Id.*  Accordingly, although they did not accept the offers in the letters, the plaintiffs alleged that the collection letters sent by the defendants could have misled them. *Id.* at 1002–03.  The court determined that any risk to the plaintiffs dissipated before they filed their suit. *Id.*  Neither plaintiff acted on the collection letters, and, by filing the suit, they could not allege that they were at risk of being misled in the future. *Id.*  This lack of risk in the future meant that they did not allege an injury in fact. *Id.*  "[I]t is the plaintiff's burden to establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue,

and that the 'threatened injury [is] certainly impending.'" *Friends of the Earth*, 528 U.S. at 190 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (citations and internal quotation marks omitted). Accordingly, the Court now turns to whether Plaintiff's alleged risk-as-injury actually exists.

### a. The Annex to ESF 8 was a nonbinding, voluntary plan; it was not a rule with the force of law under the AAPA, and it did not carry the force of law under the EMA.

The Plaintiff argues that, because the Annex to ESF 8 is a rule under the AAPA, it must be revoked according to the AAPA's rulemaking procedures. However, the Plaintiff failed to produce any evidence that the Annex was promulgated pursuant to the AAPA. The Plaintiff rather points to the definition of "rule" within the AAPA and argues that because the Annex could fit within the definition, it therefore is a rule. (Doc. 18 at 4). The statute defines a "rule" as,

> [e]ach agency rule, regulation, standard, or statement of general applicability that implements, interprets, or prescribes law or policy, or that describes the organization, procedure, or practice requirements of any agency and includes any form which imposes any requirement or solicits any information not specifically required by statute or by an existing rule or by federal statute or by federal rule or regulation . . . .

Ala. Code § 41-22-3(9). The Plaintiff argues that because the Annex fits the definition of a rule, it must be removed according to the rulemaking provisions of the AAPA, or else it is still in effect, and the Plaintiff is still at risk. (Doc. 8); *see also* Ala. Code § 41-22-5 (outlining the requirements for adoption, amendment, or repeal of administrative rules). The Plaintiff also argues that the Annex must be revoked by Governor Ivey through proclamation because her March 13, 2020 proclamation declared, "this proclamation and

all subsequent orders, laws, rules, or regulations issued pursuant hereto shall remain in full force and effect for the duration of the public health emergency unless rescinded or extended by proclamation." (Doc. 25-1 at 3).

The Defendants respond that the Annex was never a rule and never carried the force of law; it was developed as a support plan to the EOP. (Doc. 15 at 5). The Defendants state, "[t]his plan is not, nor has it ever been, subject to the AAPA process." (*Id.*). They argue that the Annex and the EOP are purposefully "flexible and adaptable" to deal with crises much like the coronavirus pandemic, and they were adopted according to the EMA and Executive Order No. 15. (*Id.*); (*see also* doc. 23 at 7–9). They further add that Governor Ivey does not need to issue a proclamation rescinding the Annex because she is not required to do so by the EMA, EOP, or Executive Order No. 15. (Doc. 23 at 9).

The Court finds that the Annex was a nonbinding plan without the force of law, attached to the State EOP and developed under the framework of Executive Order No. 15 and the EMA.[9] First, both the Defendants and the Plaintiff agree that there is no evidence that the Annex was promulgated pursuant to AAPA rulemaking requirements. The Annex was developed with input from experts—but without formal notice and comment. In Alabama, a rule typically establishes a binding norm, and "[a]lthough it is not

---

[9] Even if the Annex to ESF 8 should have been promulgated as a rule under the AAPA, the fact that it was not would render it an invalid rule. The AAPA provides that rules not promulgated according to the statute's rulemaking requirements are invalid. *See* Ala. Code § 41-22-5(d) ("No rule adopted after October 1, 1982, is valid unless adopted in substantial compliance with this section."); Ala. Code § 41-22-10 ("In passing on such rules the court shall declare the rule invalid only if it finds that it violates constitutional provisions or exceeds the statutory authority of the agency or was adopted without substantial compliance with rulemaking procedures provided for in this chapter."). Consequently, had the Annex been improperly promulgated, it would not have been enforceable by the State prior to its removal.

determinative, an agency's characterization of its own standard as nonbinding is persuasive and deserves some weight." *Families Concerned About Nerve Gas Incineration v. Ala. Dep't of Envtl. Mgmt.*, 826 So. 2d 857, 863, 870 (Ala. Civ. App. 2002).   Thus, the Court looks to the text of the document itself to consider how the agency characterized the Annex. The Annex supplies that the ventilator triaging guidelines are nonbinding "template[s]," which are "highly recommended" for endorsement. (Doc. 8-1 at 2–3).  This language does not connote a binding rule.  Rather, the language suggests that the Annex is nonbinding and therefore not a rule with the force of law under the AAPA.

Second, the Annex was not promulgated as a law through the EMA.  The EMA requires the Governor to file all orders, rules, and regulations in the office of the Secretary of State for them to have the force of law. Ala. Code § 31-9-13.  Governor Ivey has done so each time she issued a proclamation in response to the coronavirus pandemic and when she adopted the Safer at Home emergency rule as part of her proclamation. (*See* doc 29-1). In contrast, the Annex was developed and attached to the EOP without proclamation. (Doc. 23 at 7–9).  Meanwhile, the EOP was not adopted by proclamation either and states that it is in effect unless "modified by changes in policy, planning guidance, or executive order." (Doc. 17-1 at 4).  The EOP provides internal mechanisms for adapting over time. (*Id.* at 54).  Accordingly, the Annex never carried the force of law through the EMA.

### b. The Annex is no longer in effect, and thus the Plaintiff does not have standing.

The Plaintiff fails to establish standing because the Court cannot find a concrete injury that is either actual or imminent—the State renounced the Annex before an injury

could occur. *See Lujan*, 504 U.S. at 560–61. Accordingly, the Plaintiff's risk-as-injury dissipated by the time the complaint was filed. *See Trichell*, 964 F.3d at 1000. The State agency removed the Annex from the CSC Guidelines on February 28, 2020. The Plaintiff filed suit on or about the same day that HHS's OCR announced the resolution of its review of the Annex. As a result, the Annex was no longer offered as a template or guideline as of April 8, 2020.[10] (Doc. 9 at 29). The ADPH was not required to follow rulemaking procedures to revoke the Annex; Governor Ivey was not required to revoke the Annex through proclamation. Like the plaintiffs in *Trichell*, the Plaintiff here is safe from the risk-of-injury alleged and never incurred an injury in fact. *See* 964 F.3d at 1002–03 ("The complaints thus did not, and could not, make any allegation that [the plaintiffs] [were] at risk of being misled in the future."). Consequently, the Plaintiff does not have standing.

### 2. *The Plaintiff also fails to establish causation and redressability.*

Briefly, because the Plaintiff does not allege an injury in fact, she cannot establish a causal connection between any injury and the conduct of which she complains. *See Lujan*, 504 U.S. at 560; *see also Trichell*, 964 F.3d at 998 (noting that the plaintiffs failed to demonstrate damages, let alone that relying on the defendants' actions caused damages). Moreover, even if the Plaintiff did allege an injury in fact and causation, she would not have standing for want of redressability. "[I]t must be likely, as opposed to merely

---

[10] Even if the Plaintiff had standing at the time of filing, her standing has dissipated. Furthermore, her claims are moot. *See Troiano v. Supervisor of Elections*, 382 F.3d 1276, 1284 (11th Cir. 2004). The Eleventh Circuit has found "a challenge to a government policy moot when it has been replaced by a new policy that 'appears to have been the result of substantial deliberation' on the part of the alleged wrongdoers and have been 'consistently applied' in the recent past." *Id.* Here, the State of Alabama has made it unambiguously clear that the challenged conduct cannot reasonably be expected to recur. In the absence of any evidence that the policy will be reinstated, this suit may not continue.

speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal quotations omitted).  Here, it is neither likely nor speculative that the injury will be redressed; the Plaintiff's redress has already occurred.  This Court cannot issue a declaratory judgment finding the Annex null and void; it is already null and void. Injunctive relief is similarly impossible, as are any other claims for relief requested by the Plaintiff.

### C. The Motion for Preliminary Injunction, Motions to Dismiss, and Motions for Summary Judgment

Because the Court lacks jurisdiction over the underlying case, the Court pretermits discussion of the Plaintiff's motion for preliminary injunction and concludes that the Plaintiff cannot demonstrate a substantial likelihood of success on the merits.  The Court likewise determines that discussion or analysis of the pending dispositive motions is not necessary or appropriate as the Court lacks jurisdiction in this case.

## V.    CONCLUSION

In sum, the Plaintiff does not have standing because she cannot establish an injury in fact.  The Plaintiff's alleged risk-as-injury dissipated because the Annex is no longer in effect.  Furthermore, the Plaintiff cannot establish causation or redressability.

Accordingly, it is ORDERED as follows:

(1) the Plaintiff's complaint is dismissed without prejudice for lack of Article III standing, and

(2) all pending motions are DENIED as moot.[11]

A separate final judgment will be entered.

DONE this 19th day of November, 2020.

_____/s/ Emily C. Marks_____
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE

---

[11] When a Plaintiff fails to establish Article III standing, the Court denies all pending motions as moot. *See, e.g.*, *Lonchar v. Thomas*, 58 F.3d 588, 589 (11th Cir. 1995); *see also Daniels v. Upton, Ga. Dep't of Corrs*, 2018 WL 757811, at *1 (11th Cir. Dec. 11, 2018).